**O**

# United States District Court
# Central District of California

| | |
|---|---|
| INTERNATIONAL FRUIT GENETICS, LLC,<br><br>              Plaintiff,<br><br>   v.<br><br>P.E.R. ASSET MANAGEMENT TRUST; PIETER EDUARD RETIEF REDELINGHUYS N.O., in his capacity as trustee for the time being of the P.E.R. ASSET MANAGEMENT TRUST; and DEBORAH MARY REDELINGHUYS N.O., in her capacity as trustee for the time being of the P.E.R. ASSET MANAGEMENT TRUST,<br><br>              Defendants. | Case No. 2:14-cv-05273-ODW(MRW)<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [57] AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [58]** |

## I. INTRODUCTION

Until recently, Defendants Pieter Redelinghuys, Deborah Redelinghuys, and P.E.R. Asset Management Trust ("Trust") (collectively, "Defendants") were an approved licensee of Plaintiff International Fruit Genetics, LLC ("IFG") for certain table grape plant varieties in South Africa. This case arises from Defendants' alleged

theft, illegal importation, and propagation of Plaintiff's proprietary plant materials, in violation of the parties' licensing agreements. Before the Court are Defendants' and IFG's cross-Motions for Summary Judgment. (ECF Nos. 57, 58.)

At issue is whether Defendants breached the plain language of the licensing agreements, and whether IFG validly terminated the agreements. Defendants contend that no reasonable jury could find that the alleged breaches are sufficiently material so as to justify termination of the agreements between the parties. For the reasons discussed below, the Court **GRANTS** IFG's Motion (ECF No. 57) and **DENIES** Defendants' Motion (ECF No. 58).

## II. FACTUAL BACKGROUND

### A. Background

IFG is a California-based company that invents, develops, and licenses proprietary hybrid table grape varieties in the United States and other countries. (First Am. Compl. ("FAC") ¶ 9, ECF No. 11.) IFG principally derives its income from the intellectual property rights it holds in the proprietary plant varieties that it develops. (IFG's Statement of Uncontroverted Facts ("SUF") 3–4, ECF No. 58-4.)

Mr. Redelinghuys is a grape grower and marketer based in South Africa. (FAC ¶ 19.) Mr. and Mrs. Redelinghuys, as trustees of the Trust, were an approved licensee of IFG, authorized to grow and market certain IFG table grape varieties in South Africa. (SUF 13.) The Trust is in possession of, and still growing, nearly 137,000 IFG proprietary plants as a result of the licensing agreements. (*Id.* 14.)

After IFG develops a new table grape variety, it applies for "plant variety rights" for the new grape in a number of countries. (*Id.* 2.) IFG then enters license agreements with parties in those countries which allow them to grow, evaluate, market, farm, and/or sell table grapes from IFG's proprietary varieties, subject to the terms and conditions of the agreements. (FAC ¶ 12.)

IFG does not provide its plant materials directly to its licensees in foreign countries; rather, IFG enters into license agreements with table grape nurseries designed to closely control and monitor the propagation of its grapevines. (SUF 8.) In South Africa, there is only one nursery permitted to propagate IFG's proprietary plants, Voor-Groenberg Nurseries ("VGN"). (*Id.* 10.) In addition, IFG's licensing agreements expressly prohibit the licensee from propagating IFG's plants on their own without the written approval of IFG. (Marcos Decl., Ex. A, Testing Agreement § 7, ECF No. 58-2.)

Because IFG and VGN entered into their Propagator Agreement in 2008, during the first several years of IFG's and Trust's relationship, IFG gave Trust (and another South African grower) permission to propagate small quantities of a limited number of IFG proprietary varieties which had already cleared quarantine in South Africa. (Defendants' Undisputed Facts ("UF") 6, ECF No. 57-2.)

Defendants contend that even after IFG and VGN entered into their Propagator Agreement in 2008, Trust continued to propagate IFG grape varieties with the knowledge and consent of both IFG and VGN. (*Id.* 7.)

IFG disputes this fact and instead states that after IFG retained VGN as its licensed propagator in 2008, IFG did not permit any further propagation of material by its growers in South Africa. (IFG's Additional Facts ("AF") 87–88, ECF No. 60-2.) Instead, IFG states that after 2008, it only permitted Defendants to "top work" or "field graft" plants using buds supplied by VGN, or taken from the grower's fields under VGN's supervision. (AF 89.)

**B.     IFG's Licensing Agreements with Trust**

In July 2004, IFG entered into three separate licensing agreements with Mr. and Mrs. Redelinghuys and Trust: (1) a Testing Agreement; (2) a Planting Agreement; and (3) a Marketing Agreement (collectively, the "Licensing Agreements"). (SUF 12.)

Key terms of each of the Licensing Agreements are that: (1) licensees are prohibited from propagating IFG plants on their own without written approval; and (2) licensees are required to obtain all of the plant material for growing IFG proprietary plants from the licensed nursery, VGN. (Testing Agreement, §§ 7.1, 7.2(d)(i).)

### 1. The Testing Agreement

In 2004, IFG and Trust entered into an International Fruit Genetics Proprietary Variety Testing and Marketing Rights Option Agreement (the "Testing Agreement"). (SUF 15.) The Testing Agreement allowed Trust to evaluate IFG's proprietary table grape varieties and also gave Defendants an option to enter into a marketing rights agreement with IFG, described below. (*Id.* 16.)

### 2. The Planting Agreement

On or around April 1, 2010, IFG and the Trust entered into the International Fruit Genetics Proprietary Variety Planting Rights and Trademark License Agreement (the "Planting Agreement"). (*Id.* 18.) In essence, the Planting Agreement allowed the Trust to plant and grow IFG proprietary plants of certain varieties, in certain quantities, and in certain locations specified in advance and in writing. (*Id.* 19.)

### 3. The Marketing Agreement

On or around April 1, 2010, the Trust exercised the option set forth in the Testing Agreement and entered into the International Fruit Genetics Proprietary Variety Marketing Rights and Trademark License Agreement (the "Marketing Agreement"). (*Id.* 21.) In short, the Marketing Agreement allowed the Trust to: (1) request that IFG enter into a planting agreement with the Trust or with other grape growers; and (2) market and sell fruit grown by grape growers who have entered into a planting agreement with IFG. (*Id.* 22.)

### 4. Events of Default Under the Licensing Agreements

Each of the Licensing Agreements is subject to "general terms and conditions" which are provided in "Exhibit F" to each agreement. (*Id.* 24.) The general terms and

4

conditions to each of the Licensing Agreements are identical in all material respects. (*Id.* 25.) Exhibit F provides, *inter alia*, specific Events of Default and further states that upon an Event of Default, IFG may immediately terminate the relevant agreement upon delivery of written notice to Trust. (*Id.* 26.)

## C. Events Leading to Termination

### 1. Importation and Propagation of the Sugar Crisp

In March 2014, during a routine inspection, a VGN representative observed 277 Sugar Crisp plants growing on Trust's property. (*Id.* 29.) The Sugar Crisp plants were labelled "093-166," IFG's selection number for Sugar Crisp. (UF No. 40.) At the time these plants were discovered, the Sugar Crisp variety had only recently cleared quarantine and the plant material was not yet available for growers, so the VGN representative thought this finding suspicious. (SUF 30.) IFG had the plants' DNA analyzed, which confirmed confirmed that the plants in Defendants' vineyard were IFG Sugar Crisp vines. (*Id.* 31–32.)

Between 2009 and 2012, IFG unsuccessfully attempted to import the Sugar Crisp into South Africa three times for variety testing. (UF 26–33.) In response to these unsuccessful attempts, Mr. Redelinghuys took a cutting of a Sugar Crisp grapevine from an IFG vineyard in California and smuggled it into South Africa in his suitcase, bypassing quarantine. (UF 35.) Mr. Redelinghuys then used the cutting to make the 277 vines that Trust was growing in 2014. (SUF 42.) On April 4, 2014, Mr. Redelinghuys admitted to this conduct at a meeting attended by representatives from VGN and IFG. (*Id.* 35.)

Thereafter, in a letter dated May 9, 2014, IFG notified Defendants that their importation and unauthorized propagation violated the parties' Testing Agreement. (*Id.* 36.) That same letter informed Defendants that they also violated IFG's plant breeder's rights under South African law by illegally importing the Sugar Crisp. (*Id.* 37.)

IFG demanded that Defendants remove and destroy the Sugar Crisp plants; Defendants promptly complied. (*Id.* 43–44.) In addition, IFG notified South African authorities of the illegal importation. (*Id.* 44–45.)

### 2. Propagation of Other Varieties

In May 2013, VGN determined that Defendants had quantities of other IFG varieties in excess of the number that could be grown from the plants and budwood provided to Defendants by VGN. (*Id.* 50–51.) In October 2013, VGN prepared a report for IFG which highlighted the discrepancy. (*Id.*) The report stated in relevant part: Defendants received only 20 buds of Candy Hearts from VGN, yet were growing 540 plants of this variety; Defendants received only 70 buds of Sweet Joy from VGN, yet were growing 1,960 plants of this variety; Defendants received only 130 buds and 58 grafted plants of Sweet Favors from VGN, yet were growing 1,840 plants of this variety; Defendants received only 40 of Sweet Globe from VGN, yet were growing 1,680 plants of this variety; and Defendants received only 60 buds and 10 grafted plants of Sweet Sapphire from VGN, yet were growing 864 plants of this variety. (*Id.* 52.)

Mr. Redelinghuys disagrees with these numbers; he testified in deposition that he obtained "most" of the plant material resulting in these plants from VGN, but nevertheless conceded that Trust field grafted "a small percentage" (which he estimates is less than 5%) of plants from budwood taken from its own plants. (*Id* 53.)

**D. Termination**

On June 11, 2014, IFG sent a letter to Defendants providing notice that the Testing Agreement had been terminated due to Defendants' importation and unauthorized propagation of IFG material. (*Id.* 56.) On June 26, 2014, IFG sent a letter to Defendants providing notice that the Marketing Agreement and the Planting Agreement had also been terminated. (*Id.* 57.)

**E. Procedural History**

On December 10, 2014, IFG and Defendants both filed their Motions for Summary Judgment. (ECF Nos. 57, 58.) Both parties filed a timely opposition and reply. (ECF Nos. 59–62.) The Motions are now before the Court for decision.

### III. LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial. *Id.*; Fed. R. Civ. P. 56(c). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### IV. DISCUSSION

IFG moves for summary judgment or partial summary judgment on its claims for breach of contract and declaratory relief based on its valid termination of the Agreements. (IFG Mot. for Summ. J. ("IFG Mot.") 1, ECF No. 58.) IFG submits

7

that Mr. Redelinghuys' admissions relating to his importation and propagation of IFG proprietary plant material are dispositive on the issue of breach and constitute "Events of Default" under the contract. (*Id.*)

Defendants, on the other hand, argue that they are entitled to summary judgment on those same two claims because its alleged conduct, if it does constitute a breach, was not sufficiently material to terminate the Agreements. (Defs.' Mot. for Summ. J. ("Def Mot.") 1, ECF No. 57.) Furthermore, even if the Court finds that the alleged conduct was sufficiently material to justify termination, Defendants argue that IFG: (1) waived any right to terminate the Agreements, (2) is estopped from enforcing the Agreements, and (3) cannot terminate the Agreements without providing Trust an opportunity to cure. (Defendants' Opposition to IFG's Motion for Summary Judgment ("Def Opp'n") 11, ECF No. 59.)

For the reasons discussed below, the Court concludes that IFG validly terminated the Agreements with Trust.

**A. Breach**

IFG argues that Defendants breached the Agreements in two ways: (1) by propagating and self-sourcing the Sugar Crisp, as well as other plant varieties, outside of IFG/VGN, and (2) by importing the Sugar Crisp outside of quarantine. (IFG Mot. 10–12.) IFG further contends that each of these alleged breaches constitute an "event of default" under the Testing and Planting Agreements. (*Id.* 15.)

**1. Propagation/Self-Sourcing**

IFG asserts that Defendants breached Section 7.2(d)(i) of the Testing Agreement[1] by propagating the Sugar Crisp and other IFG varieties and breached Section 7.1 by self-sourcing the same. (*Id.* 10–12.)

**a. Section 7.2(d)(i) and 7.1**

---

[1] Sections 9.1, 9.3, and 9.3(d)(i) of the Planting Agreement contains the same language as Sections 7.1, 7.2, and 7.2(d)(i) of the Testing Agreement, respectively. Thus, a breach of Section 7.1 and 7.2(d)(i) of the Testing Agreement is also a breach of Section 9.1 and 9.3(d)(i).

Section 7.2(d)(i) expressly prohibits the Trust from propagating any of IFG's proprietary plant material on its own: "Licensee shall: not . . . propagate, cultivate or otherwise deal with any Organic Material in any way that might seek to replicate any component thereof or to produce any fruit, plant material or component similar thereto."[2] Further, Section 7.1 requires Defendants to obtain all of their IFG proprietary plant material from VGN: "Licensee shall obtain all [of] its requirements for Organic Material and Owner Confidential Information exclusively from Owner, the Licensed Propagator (to the extent provided hereinabove) or from such other Person as Owner may from time to time approve or designate in advance in writing. Licensee shall not obtain Organic Material or Owner Confidential Information from any other source whatsoever."

It is undisputed that Defendants propagated and self-sourced Organic Material without authorization from IFG, in violation of these provisions. Mr. Redelinghuys admits that he field grafted (a type of propagation) several IFG plant varieties—Sweet Globe, Candy Hearts, Sweet Joy, Sweet Favors, and Sweet Sapphire—using plant material obtained from his own property and not from VGN or IFG (a type of self-sourcing). (SUF 53.) Mr. Redelinghuys used plant material from Trust's own plants to propagate what in his words is a "small amount" or "less than 5%" of the IFG plants grown by Trust. (*Id.* 53.) Considering Trust was growing 136,960 IFG proprietary plants in 2014, Mr. Redelinghuys essentially admits he may have propagated over 6,800 unauthorized plants. (*Id.* 54.) This admitted conduct is a breach of Section 7.2(d)(i) and 7.1, which prohibits any unauthorized propagation/self-sourcing by Trust or its affiliates.

---

[2] Organic Material is defined in Exhibit A of the Testing Agreement as follows: "'Organic Material' means all the Fruit, the Graftwood, the Plants, the Plant Material, the Ovules, the Pollen, the Embryos, and the Seeds produced from IFG Proprietary Varieties, that either may be provided to the Licensee by the Owner or the Licensed Propagator from time to time, or are grown or otherwise developed from the same by the Licensee, or otherwise comes into the Licensee's possession; Organic Material does not include (among other things) that portion of any existing vine on the Property which is below any graft of Graftwood." (Testing Agreement, Ex. A.)

IFG also argues that Defendants breached Section 7.2(d)(i) and 7.1 by propagating and self-sourcing the Sugar Crisp. (IFG Mot. 10–12.) Mr. Redelinghuys admitted in his deposition that he took a shoot of Sugar Crisp from California from which he field grafted four vines in late 2012 on his property in South Africa. (*Id.* 41.) From these four vines he later propagated additional Sugar Crisp plants, so that by 2014, there were approximately 277 Sugar Crisp plants on the property. (*Id.* 42.) Defendants contend that they did not breach Section 7.2(d)(i) or 7.1 in so doing because IFG authorized the propagation of the Sugar Crisp. (Def Opp'n 7.)

Section 5.1 of the Testing Agreement entitles Defendants to propagate Organic Material only in accordance with the Licensing Agreements, and only upon "reasonable written instruction" from IFG. As such, Defendants contend that Trust was propagating the Sugar Crisp with the knowledge and consent of IFG. (*Id.*). Specifically, Defendants present evidence that in 2013, Mr. Redelinghuys sent a letter to Tersia Marcos and Pam Dykes, IFG's International Business Manager and Office Manager (respectively), stating that he would be "increasing 093-166 [Sugar Crisp] to about 200 plants this year." (UF 35.) Dykes responded to Mr. Redelinghuys' email and thanked him for providing the information. (*Id.* 36.) During a deposition, Marcos explained that in this email correspondence, she thought Mr. Redelinghuys was attempting to propagate the black Sugar Crisp grape that was brought through quarantine in 2009, and not the white Sugar Crisp at issue (which had not yet passed through quarantine). (AUF 90.) Defendants state that Marcos' explanation is not a reasonable one because there was no commercial value in the black Sugar Crisp and therefore no reason for Trust to grow that variety. (*Id.* 92.)

A reasonable jury could conclude that, despite the confusion, IFG unwittingly gave Defendants written authorization to propagate the white Sugar Crisp beyond what was agreed to under the contract. As such, the Court cannot conclude as a matter of law that this conduct breached Section 7.2(d)(i) or 7.1.

In sum, the Court concludes that Mr. Redelinghuys breached Section 7.2(d)(i) and 7.1 only by propagating and self-sourcing Sweet Globe, Candy Hearts, Sweet Joy, Sweet Favors, and Sweet Sapphire, but not Sugar Crisp.

### b. Event of Default

First, Defendants argue that even if their conduct constituted a breach, it was not sufficiently material to justify IFG's termination of the Licensing Agreements. (Def Mot. 1; Def Opp'n 11.) Defendants state that California law permits termination of a contract only if the breach can be classified as "material," "substantial," or "total." *Super. Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051 (1987); *see also Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 601 (1969). (Def Opp'n 11.) Therefore, Defendants contend that "[a] breach will justify rescission of a licensing agreement only when it is of such a material and substantial nature that it affects the very essence of the contract and serves to defeat the object of the parties ." *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) (quotation marks omitted). (*Id.* 12.)

Defendants are attempting to apply general California contract principals to the present case, disregarding the express terms of the contract. The Agreements clearly set forth the specific grounds on which IFG may terminate the contract. (Testing Agreement, Exhibit F § 11.2.) "When a contract has a termination clause, the clause controls and a party to the contract may only terminate in accordance with the terms specified." *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11-6121 CW, 2014 WL 171830, at *4 (N.D. Cal. Jan. 15, 2014); *see also Kuffel v. Seaside Oil Co.*, 11 Cal. App. 3d 354, 368 (1970); *Mad River Lumber Sales, Inc. v. Willburn*, 205 Cal. App. 2d 321, 324 (1962). Since the parties expressly addressed the "Events of Default" that would lead to termination, the Court must assess the conduct of the parties according to their Agreement. *See Centigram Argentina, S.A. v. Centigram Inc.*, 60 F. Supp. 2d 1003, 1012 (N.D. Cal. 1999). Lastly, neither party cites extrinsic evidence which

would suggest that the provisions of the termination clause should be extended by implication to include additional requirements. *Apra v. Aureguy*, 55 Cal. 2d 827, 830 (1961) ("In the absence of substantial parol evidence tending to solve an ambiguity, the terms of a contract will not be extended by implication.").

Section 10.1(a) of Exhibit F to each of the Licensing Agreements expressly defines "Event of Default" to include Defendants' failure to perform "any of its obligations" under Section 7 of the Testing Agreement or Section 9 of the Planting Agreement. Further, Section 11.2 of Exhibit F to each of the Licensing Agreements expressly provides that, "upon any Event of Default, Owner may immediately terminate the Agreement upon delivery of written notice of termination to Licensee." Therefore, IFG need only show "any" failure of Defendants under those sections in order to "immediately terminate." (Testing Agreement, Exhibit F, §§ 10.1(a), 11.2.)

In their opposition papers, Defendants admit that they engaged in certain conduct—conduct that IFG submits provides grounds for immediate termination under the plain language of the Licensing Agreements. Defendants do not dispute that they used IFG plant material grown on their own farm ("self-sourcing") to unilaterally self-propagate Sweet Globe, Candy Hearts, Sweet Joy, Sweet Favors, and Sweet Sapphire. (SUF 40, 41, 42, 53.) As discussed above, these acts contravene the plain language of Sections 7.1 and Section 7.2(d)(i) of the Testing Agreement, and therefore constitute Events of Default. (Testing Agreement, Exhibit F § 10.1(a).) Consequently, when IFG gave notice of termination to Defendants (SUF 56), the Licensing Agreements were validly and properly terminated pursuant to Section 11.2.

### c. Waiver

Defendants contend that even if their conduct was sufficiently material to justify termination, IFG waived any right to terminate the Agreements. (Def Opp'n 17.) "[W]aiver is the intentional relinquishment of a known right after knowledge of the facts." *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 31 (1995) (internal quotation

marks omitted). "The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.'" *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107–08 (1966). Here, Defendants fail to establish waiver by clear and convincing evidence.

On the issue of Sweet Globe, Candy Hearts, Sweet Joy, Sweet Favors and Sweet Sapphire, Defendants state that IFG waived any right to terminate the Agreements based on propagation of these varieties because IFG knew of the propagation in May 2013, but did nothing about the alleged breach until it needed a pretextual reason to terminate the Agreements in 2014. (Def Opp'n 8.)

Section 14.3 of the Testing Agreement expressly provides that there would be no waiver of any provision of the contract without a signed writing. Further, Section 14.2 states that "No failure or delay by a Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof . . . ." Here, no such signed writing exists.

Defendants have not presented any facts to prove waiver by clear and convincing evidence, have not offered facts proving that IFG freely and knowingly gave up its right to have the no-propagation provisions enforced, and have not presented evidence of a signed writing. As such, the Court finds that IFG did not waive its right to terminate the Agreements.

### d. Estoppel

Next, Defendants argue that IFG should be estopped from terminating the Agreements because IFG knew for years that Trust was propagating larger than allegedly authorized amounts of Sweet Globe, Candy Hearts, Sweet Joy, Sweet Favors, and Sweet Sapphire from the royalties it accepted. (Def Opp'n 20.) The Court, however, concludes that Defendants fail to establish estoppel based on the parties' conduct.

The doctrine of estoppel has four elements: "(1) The party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Skulnick v. Roberts Express, Inc.*, 2 Cal. App. 4th 884, 890 (1992).

Defendants have neither presented the elements of this equitable defense to the Court, nor shown that they will be able to meet each of the required elements. *See Driscoll v. City of L.A.*, 67 Cal. 2d 297, 305 (1967). First, Defendants do not present evidence to show that IFG was apprised of all of the facts. Defendants claim that by accepting royalty payments, IFG was aware of the larger than allegedly authorized propagation. (Def Opp'n 9.) Defendants, however, do not present evidence of royalties paid or accepted beyond what was allowed under the contract. As such, there is no evidence to show that IFG knew about any self-propagation undertaken by Defendants until May 2013, when it performed a routine inspection of Trust's property.

In addition, any reliance on a plaintiff's actions or inactions must be reasonable to satisfy the standard for estoppel. *See Martinez v. Scott Specialty Gases, Inc.*, 83 Cal. App. 4th 1236, 1238 (2000) (holding that "[e]stoppel requires, among other things, reasonable reliance on the other party's actions" and rejecting estoppel where "plaintiffs could not reasonably have been misled"). Any reliance by Defendants was unreasonable because when IFG learned of the discrepancies in May 2013, it informed Mr. Redelinghuys that his self-propagation was unauthorized and that he needed to follow the letter of the contract. (Marcos Depo. 197:15–202:11, Scott Dec'l, Ex. D.)

Lastly, the Agreements that IFG and Defendants both signed states that the failure to exercise any right under the Agreement shall not constitute a waiver of such a right because, as any waiver must be in a signed writing. (Testing Agreement, §§

14.2, 14.3.) This too weighs against the reasonableness of any reliance that Defendants may have had upon IFG's actions or inactions. *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 979 (N.D. Cal. 2006).

In sum, the Court finds that Defendants failed to satisfy the elements of estoppel by failing to prove that IFG was "appraised of the facts" at the time it allegedly induced reliance on its actions and by failing to prove that their reliance on these actions was reasonable. Thus, the Court finds Defendants' arguments for estoppel unavailing.

### e. Cure

Defendants' final argument is that IFG cannot terminate the agreements without giving Defendants an opportunity to cure, whether or not the agreements allow for such a cure. Defendants, however, cite to no California law for this remarkable proposition and the law is to the contrary. Under California law, a court is "bound to give effect to the plain and ordinary meaning of the language used by the parties." *Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th 677, 684 (2000). Thus, where "contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." *Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 53 (1997).

Here, the Agreements between the parties are clear. They do not allow the opportunity to cure when a party fails to perform its obligations under Section 7 of the Testing Agreement. (Testing Agreement, § 10.1(a).) As discussed above, the Court found that Defendants' self-sourcing and propagation violated Sections 7.1 and 7.2(d)(i) of the Testing Agreement. As such, Defendants are not entitled to the opportunity to cure. Consequently, when IFG gave notice of termination to Defendants, the Licensing Agreements were validly and properly terminated pursuant to Section 11.2.

### 2. Importation

Next, IFG states that Defendants also breached the Agreements by importing Sugar Crisp outside of quarantine. (IFG Mot. 10–12.) IFG further contends that this alleged breach constitutes an Event of Default both under the Testing and Planting Agreements. (*Id.* 15.)

It is undisputed that Mr. Redelinghuys imported the Sugar Crisp plant variety into South Africa without clearing quarantine, and propagated 277 plants of Sugar Crisp from the same. (SUF 40.)

Defendants claim that Mr. Redelinghuys' importation of Sugar Crisp outside the quarantine process was not a *sufficiently material* breach for the following reasons: (1) IFG admitted that it suffered no damages as a result of the alleged breach; (2) IFG failed to identify any South African law that Mr. Redelinghuys allegedly violated, provide any testimony from a South African law expert on whether his conduct actually violated those laws, and provide any evidence of an investigation or charges brought against Mr. Redelinghuys; (3) Defendants had the right to test and grow Sugar Crisp in South Africa, and were merely furthering the object of the Agreements to grow IFG grape in South Africa; (4) Mr. Redelinghuys informed IFG that he would be propagating Sugar Crisp in July 2013, yet IFG took no action for almost a year; and (5) Defendants cured the breach by immediately destroying the Sugar Crisp plants imported outside of quarantine. (Def Mot. 19.)

As discussed above, it is of no import whether the alleged breach is *sufficiently* material. Since the parties expressly addressed the "Events of Default" that lead to termination, the Court must assess the conduct of the parties according to their Agreement.

Section 5.2 Testing Agreement provides that the "Licensee shall perform Licensee's obligations hereunder in accordance with all applicable Laws, and Licensee shall obtain and forward to Owner all Clearances." The Testing Agreement

requires Defendants to comply with the law, and IFG presents sufficient evidence to show that Mr. Redelinghuys' actions violated this command.

It is undisputed that Mr. Redelinghuys imported the Sugar Crisp plant variety into South Africa without clearing quarantine. (SUF 40.) In addition, IFG presented evidence that importation of an "unlisted variety without authorization" is a violation of Section 26(1)(a)(i) of the Plant Improvement Act of 1976 of South Africa ("PIA"). (Marcos Decl. ¶ 31, Reply to Def Opp'n, ECF No. 62-3.) IFG further presented evidence that Section 35(1)(g)(ii) of the PIA states that any person who "imports any plant or propagating material in contravention of section 26 . . . shall be guilty of an offence and liable on conviction." (*Id.* ¶ 27) Because Mr. Redelinghuys failed to enter the Sugar Crisp into the varietal list upon importation, it is considered an "unlisted variety," and a violation of PIA. (*Id.* ¶¶ 27, 31.)

Defendants state that this Court is not in a position to interpret South African Law without an expert. (Def Mot. 19.) However, Federal Rule of Civil Procedure 44.1 provides "a uniform and effective procedure for raising and determining an issue concerning the law of a foreign country." Fed. R. Civ. P. 44.1 advisory committee's notes. "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

Because the Court determined as a matter of law that Mr. Redelinghuys violated South African law by importing the Sugar Crisp, the Court also concludes that he violated Section 5.2 Testing Agreement, which requires licensees to comply with all applicable laws. On the basis of this violation, IFG had the right, pursuant to Section 10.1(c) and (g) of Exhibit F of the Testing Agreement (prohibiting Licensee from violating its obligations under the Agreements and infringing IFG's plant variety

rights), to declare an "Event of Default" and terminate the Testing Agreement immediately. (Testing Agreement, § 11.2.)

On May 9, 2014, IFG informed Defendants that it was prepared to declare such default unless Trust and IFG could "agree to a global resolution of all issues" and if Trust destroyed the Sugar Crisp plants in the presence of IFG representatives. (Marcos Dec'l, Ex. D.) Mr. Redelinghuys destroyed the Sugar Crisp plants one day after IFG's request to do so, and Defendants argue that this cured any alleged breach. (AUF 96; Def Opp'n 5.) Section 10.1(c) of Exhibit F provides that any failure under the Agreement should not be considered an "Event of Default" if, in the opinion of IFG, the failure has been remedied or cured within fifteen days.

On May 19, 2014, Mr. Redelinghuys and IFG attended a meeting where the parties discussed a number of issues regarding the Trust's compliance with the terms of the Testing Agreement. (Marcos Dec'l, Ex. E.) After review of all of the facts and circumstances by the Board of Directors, IFG notified Mr. Redelinghuys on June 11, 2014, that it terminated the Testing Agreement, as provided in Section 11.2 of Exhibit F. (*Id.*) In the opinion of IFG, Defendants did not, and probably could not, cure their breach. As such, the Court concludes that IFG validly terminated the Agreements with Trust based on the illegal importation of the Sugar Crisp.

In sum, the Court **GRANTS** IFG's Motion for Summary Judgment (ECF No. 58) based on Defendants' self-sourcing/propagation of Sweet Globe, Candy Hearts, Sweet Joy, Sweet Favors, and Sweet Sapphire and illegal importation of Sugar Crisp and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 57).

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** IFG's Motion for Summary Judgment (ECF No. 58) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 57). The parties shall submit a proposed judgment to the Court consistent with this Order.

**IT IS SO ORDERED.**

April 20, 2016

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**